**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **ISAIAH BRADY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 2098** |
| | ) | |
| **MARCUS HARDY, Warden,** | ) | |
| **Stateville Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2002, following a bench trial, an Illinois judge found Isaiah Brady guilty of first degree murder. The judge later sentenced Brady to a fifty year prison term.

Brady exhausted his state court remedies and has now petitioned this Court for a writ of habeas corpus. In his petition, Brady argues that insufficient evidence existed to support his conviction; he received ineffective assistance of counsel; and the introduction of improper evidence of other crimes violated his due process rights. For the reasons stated below, the Court orders an evidentiary hearing to permit further development of the factual basis for Brady's ineffective assistance claim but otherwise denies Brady's petition.

## Background

Andrea McDaniel was Brady's girlfriend and the mother of his child. In the early morning hours of May 10, 2001, McDaniel was brought to the emergency room at

Provident Hospital on the south side of Chicago.  She was unconscious and had sustained a single gunshot wound to the head.  After receiving treatment, McDaniel was transferred to Cook County Hospital, where she died on May 12, 2001.  The medical examiner ruled McDaniel's death a homicide, and Brady became a suspect in the ensuing investigation by the Chicago Police Department.  On June 6, 2001, Brady was arrested in Los Angeles, California.  He was extradited to Illinois and charged with first degree murder.

1.    **State court trial**

Brady's bench trial began on November 12, 2002.  He was represented by Lawrence Vance.  Brady waived his right to a jury trial prior to opening statements.

The prosecution's first witness was Nancy Jones, an assistant medical examiner who had performed an autopsy on McDaniel's body.  She testified as an expert in the field of forensic pathology.  Jones testified that McDaniel died as a result of a single gunshot wound to the right temporal/parietal region of her skull.  Because there was no evidence of close-range firing, Jones concluded that the shot was fired from at least two feet away.

Cassandra McDaniel, Andrea McDaniel's mother, testified that until she died, McDaniel lived with Brady and the couple's eighteen-month-old daughter at 5608 South Wabash Avenue, apartment 303.  She also stated that the last time she saw McDaniel was two weeks prior to her death.

Gail Gray, an emergency room nurse at Provident Hospital, testified that she was on duty when McDaniel arrived at the hospital at approximately 1:35 a.m. on May 10, 2001.  Gray said a security guard informed her that someone was outside who seemed

to have been shot.  She went outside and saw McDaniel lying in the back seat of a car with blood on her head.  Brady was with McDaniel and identified himself as her boyfriend.  Gray and other hospital personnel put McDaniel in a wheelchair and took her to a resuscitation room.  Gray then went to speak with Brady, who provided some information about McDaniel's medical history.  After speaking with Brady, Gray returned to the resuscitation room.  Ten to fifteen minutes later, a police officer came to the resuscitation room looking for Brady, but Gray was unable to find him.

Corey Hall testified that he and his sister, Beverly Green, were close friends of McDaniel.  At the time of McDaniel's death, Hall lived in an apartment across the courtyard from the apartment McDaniel and Brady shared.  On the evening of May 9, 2001, Hall was sitting with several friends, including Brady and McDaniel, on his back porch.  At one point while Brady was present but before McDaniel had arrived, a silver .38 caliber pistol fell out of Brady's pants and onto the porch.  According to Hall, Brady said nothing and immediately put the pistol back into his pants.  Hall said he later told someone about the incident but admitted he did not mention it during his first conversation with an investigator from the State's Attorney's office.

Hall also testified that Brady told McDaniel to go home at approximately 11:00 p.m., which she did.  Brady left approximately thirty to forty minutes later.  McDaniel briefly returned to Hall's apartment later to borrow taco seasoning, and sometime thereafter Hall went to McDaniel's apartment to eat tacos.  As he left McDaniel's apartment at approximately 12:10 or 12:15 a.m., Hall saw Brady returning to the apartment.  Then, approximately an hour and ten minutes later, Hall was walking to a nearby store and saw Brady walking down an alley towards Brady's apartment.  Hall

shook hands with Brady, and the two spoke briefly. Hall said that Brady seemed

nervous. Brady told Hall he wanted to go to the store and asked Hall to wait for him.

Brady then went up to his apartment. Hall waited for approximately three to five

minutes, but Brady never came down, so Hall went to the store without him. Hall also

testified that Brady and McDaniel did not have a phone in their apartment, and the

nearest payphone was approximately one block away.

Antoinette Dill testified that she lived in an apartment one floor down and across

from the apartment Brady and McDaniel shared. At approximately 1:30 a.m. on May

10, 2001, Dill awoke to the sound of Brady and another man speaking near her window.

The unidentified man said, "She's dead," and Brady said, "She's not dead yet, help me

carry her." Dill then heard a woman screaming for someone to call an ambulance and

saying "don't move her." Dill left her apartment and looked outside through her back

door. She saw Brady and a woman near a black car. When she went outside to help,

she saw Brady and another man putting McDaniel into the back seat of the black car

and a woman sitting on the driver's side. The woman asked Dill to call 911, but Brady

replied, "No, mama, we can't wait for an ambulance. You need to get her to [the]

hospital." Dill then returned to her apartment and called 911. When she came back

downstairs, the black car was no longer in the parking lot.

Wanda Riley, Brady's grandmother, testified that she lived just around the corner

from Provident Hospital. Some time after 1:30 a.m. on May 10, 2001, Brady came to

Riley's apartment and asked to borrow her car. Brady said that he needed the car

because McDaniel had been shot and he needed to pick up his daughter. Riley refused

because she needed her car to go to work that day. Brady then took some clothes that

belonged to Riley's son, grabbed Riley's car keys, and left the apartment.  Riley went

after Brady and stopped him as he tried to start the car.  Brady got out of the car, and

Riley took the car keys out of his hands.  Brady then ran into Washington Park in the

direction of his apartment, leaving the clothes behind.  About five minutes later, Brady's

mother and her husband arrived at Riley's home with Brady's infant daughter.

Officer Joseph Dunigan testified that he and a partner, Leonard Stoker,

investigated McDaniel's shooting.  They first went to Cook County Hospital to determine

McDaniel's condition and were told that she was in the emergency room.  The officers

then went to McDaniel's apartment, where they spoke with other officers and

photographed the scene.  Dunigan observed blood on the rear stairs of the apartment

building and in the kitchen, as well as bloody towels and clothing on the kitchen floor.

The master bedroom was in a state of disarray.  There were markings on the bedroom

door and damage to the door near the handle.  Clothes and the mattress were strewn

about, and a television set was on the floor.  Dunigan saw blood on the wall in the

bedroom and on the mattress.  He also found two live .38 caliber bullets in the

bedroom.  Finally, Dunigan examined a black Pontiac parked nearby.  He found blood

on the right front passenger seat back and headrest, on the rear passenger side door,

and on the driver's seat.  Dunigan took samples of the various blood stains.

Officer Miguel Cavrales testified that on February 22, 2000, about fifteen months

before McDaniel's death, he and a partner responded to a domestic disturbance call at

5608 South Wabash.  Cavrales spoke with McDaniel upon arriving and observed that

she had puffy eyes, a swollen eyelid, and a bump on her right cheek.  McDaniel said

she had been struck several times.  After speaking with McDaniel, Cavrales began

trying to find Brady, who was not in the apartment at the time.  Cavrales also testified

that the next day, February 23, he responded to another domestic disturbance call from

the apartment at 10:15 p.m.  On that occasion, McDaniel was agitated and jumpy when

Cavrales spoke with her.  Afterwards, Cavrales again went looking for Brady.

     Officer James Davis testified that he and another officer responded to a third

domestic disturbance call from 5608 South Wabash on June 15, 2000, about eleven

months before McDaniel's death.  When he arrived, Davis heard a woman inside the

apartment scream "help me, help me" through the door.  When Davis knocked on the

door and identified himself, a man inside said that no one had called the police.  Davis

heard the woman scream again, and the officers forced their way into the apartment.

Upon entering, Davis saw McDaniel crying and with bruises on the right side of her face

and her right arm.  She told Davis that Brady had struck her on the face and arm with a

broomstick.  The officers placed Brady under arrest.  After being informed of his rights,

Brady told the officers he hit McDaniel because she stayed out at night and did not take

care of their children.  After arresting Brady, the officers recovered a .38 caliber revolver

from the bedroom of the apartment.

     Detective Edward Adams testified that he handled Brady's extradition from

California.  Adams arrived in Los Angeles on June 21, 2001 and spoke with Brady at

the Los Angeles County Jail.  There, Brady identified himself to Adams as "Rico Holt."

     Detective Michael Rose was the last witness for the prosecution.  He testified

that he investigated the apartment shared by Brady and McDaniel on May 10, 2001.

Rose observed blood on the back stairs leading to the apartment, as well as significant

amounts of blood in the kitchen, the hallway, and a bedroom.  He also saw a crack in

the bedroom door on both sides of the doorknob.  According to Rose, the bedroom was in a state of disorder:  there were clothes on the floor, and the mattress and box spring were turned over.  Rose later went to the home of Wanda Riley, Brady's grandmother, who told Rose that Brady came to her home after 1:30 a.m. and took clothing and the keys to Riley's car.  Riley told Rose that she caught up to Brady, struggled with him to get her keys back, and heard Brady say McDaniel was dead.

After the prosecution completed its case-in-chief, Brady's trial counsel indicated that he would not call any witnesses.  However, after speaking with Brady, counsel decided to call two witnesses.  The first was Jeremy Washington, who testified that he is Brady's uncle.  But after the prosecution indicated that Brady's trial counsel had failed to disclose Washington as a witness during discovery, defense counsel ended his examination of Washington.

The second defense witness was Claude Sanders, who testified that he is Brady's grandfather.  Sanders said that on May 10, 2001, he told Brady to leave town and lie low because he had heard Brady's life was in danger.  Sanders told Brady he should turn himself in once Brady's family raised enough money to hire an attorney. After Sanders testified, the defense rested.  Following closing arguments, the court called a recess for the afternoon.

The next day, November 14, 2002, the court found Brady guilty of first degree murder beyond a reasonable doubt.  The court stated that it found Makeeta Burke's testimony credible and persuasive because she recounted details of the crime that could have been known only by Brady.  The court also noted that Corey Hall's testimony was credible and corroborative of the fact that Brady was the shooter.

The court then proceeded to discuss its conclusion that the shooting was not accidental. The court relied on what it considered to be overwhelming circumstantial evidence of an intentional shooting. First, the court noted the absence of any reliable evidence indicating an accidental shooting. Though the court felt that Burke genuinely believed Brady's claim that the shooting was accidental, it found Brady's claim to be a fabrication he made to avoid alienating Burke. The court then stated that Brady's behavior following the shooting—including his failure to call an ambulance, seek help from neighbors, or act immediately rather than wait for his mother to arrive—suggested the shooting was not accidental.

The court also found Brady's attempt to obtain clothes and a car from his grandmother to be indicative of his intent to flee. The court felt Brady's alternative explanation—that he was trying to find his infant daughter—was implausible, because Brady could have gone with his mother from the hospital directly to his apartment rather than running alone to his grandmother's home first. Moreover, Brady never returned to the hospital to check on McDaniel, nor did he turn himself in to the authorities or a trusted community figure. Instead, he sought legal advice from his grandfather and left town. In sum, the court concluded that Brady's actions were those of a person guilty of murder, not someone who accidentally injured a person he loved.

After trial, Brady fired his attorney and hired new counsel. He also filed a motion for a new trial based on ineffective assistance of trial counsel. The motion was based solely on the allegation that Brady's trial counsel was under the influence of alcohol at various points during the trial. The court held an evidentiary hearing on the motion on May 9 and May 29, 2003. Several witnesses testified, including family members of

Brady who had interacted with his trial counsel and attended the trial, Brady's trial counsel, and one of the trial prosecutors. On June 12, 2003, the court denied the motion. It concluded that no credible evidence suggested Brady's trial counsel was intoxicated at any point during trial and that contrary testimony by Brady's family members lacked credibility due to bias.

On March 8, 2004, the court sentenced Brady to consecutive prison sentences of twenty-five years for first degree murder and twenty-five years for personally discharging the firearm that caused McDaniel's death. *See* 730 ILCS 5/5-8-1(a)(1)(d)(iii).

## 2.    Direct appeal

On appeal, Brady contended that (1) the evidence was insufficient to support a conviction for first degree murder, (2) his trial counsel was ineffective for presenting inconsistent theories and failing to seek a continuance to investigate Hall's statement that Brady dropped a gun at Hall's apartment on May 9, 2001, and (3) the court erroneously admitted other act evidence.

In an order issued on August 18, 2005, the Illinois Appellate Court affirmed Brady's conviction. *People v. Brady*, No. 1-04-1152, slip op. (Ill. App. Aug. 18, 2005) ("*Brady I*"). The court rejected Brady's arguments and found that the evidence presented at trial was sufficient to support his conviction, Brady's trial counsel was not ineffective, and the trial judge did not abuse his discretion in admitting evidence that Brady had abused McDaniel in the past. Brady subsequently filed a petition for leave to appeal, which the Illinois Supreme Court denied on December 1, 2005. *People v.*

*Brady*, 217 Ill. 2d 571, 844 N.E.2d 40 (2005). Brady did not petition the United States Supreme Court for a writ of certiorari.

### 3. Brady's post-conviction petition

Brady filed a *pro se* post-conviction petition in state court on August 22, 2006, asking the court to order a hearing and vacate his conviction and sentence. Brady argued that (1) the evidence was insufficient to support his conviction, (2) his trial counsel was ineffective for not requesting an involuntary manslaughter instruction and failing to present several witnesses, (3) both trial and appellate counsel were ineffective for failing to argue that his due process rights were violated due to perjury during the grand jury proceedings, and (4) the court erroneously imposed consecutive sentences. In support of his argument regarding counsel's failure to call witnesses, Brady attached the affidavits of Marshawn Brady, Sondra Burke, Elliot Moore, and Flora Small. On September 15, 2006, the court dismissed the petition as frivolous and patently without merit. The court did not order an evidentiary hearing.

Brady appealed. His appeal focused solely on his claim of ineffective assistance of counsel due to trial counsel's failure to call certain witnesses. On July 30, 2008, the Illinois Appellate Court affirmed the dismissal of Brady's petition. *People v. Brady*, No. 1-06-3486, slip op. (Ill. App. Jul. 30, 2008) ("*Brady II*"). The court reviewed the contents of the affidavits and concluded that Brady "failed to present the gist of a constitutional claim of ineffective assistance of counsel." *Id.* at 7.

Specifically, the court found Brady's petition deficient under both requirements of the test for ineffective assistance established in *Strickland v. Washington*, 466 U.S. 668

(1984). *Brady II*, slip op. at 7-8. The court found trial counsel's actions reasonable for two reasons. First, the court noted that "although defendant asserts in his post-conviction petition that each of the affiants were 'previously interviewed by counsel,' none of the affiants aver that they ever shared the information contained in their affidavits with defense counsel." *Id.* at 7. Second, the court stated that because "none of the witnesses appear to have any direct knowledge of the shooting," it could not "conclude that trial counsel's failure to call these witnesses was unreasonable." *Id.*

With respect to prejudice, the second part of the *Strickland* test, the court "note[d] that each of the affiants was either a friend or relative of [Brady]. Accordingly, based on their close relationship to [Brady], it is unlikely that even if the witnesses had been called, that [sic] their testimony would have altered the trial result." *Id.* at 8. For these reasons, the court concluded that Brady's petition failed to establish the gist of a constitutional claim of ineffective assistance of counsel and was therefore subject to summary dismissal. *Id.* Brady filed a petition for leave to appeal, which the Illinois Supreme Court denied on September 30, 2009. *People v. Brady*, 233 Ill. 2d 568, 919 N.E.2d 356 (2009).

Brady filed a petition for a writ of habeas corpus in this Court on April 5, 2010.

## Discussion

A prisoner convicted in state court is entitled to a writ of habeas corpus if he is being held in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus only if the petitioner demonstrates that

the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1) & (2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

The "contrary to" prong of § 2254(d)(1) is met if, for example, "the state court applies a rule that contradicts the governing law set forth" by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The "unreasonable application" prong is met "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case," *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), or "unreasonably refuses to extend a principle to a context in which it should apply." *Griffin*, 622 F.3d at 641 (internal quotation marks and citation omitted). Lastly, a decision involves an unreasonable determination of the facts if the petitioner rebuts the presumption of correctness that applies to state court fact-finding by clear and convincing evidence. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). This latter standard "is demanding but not insatiable . . . . [D]eference does not by definition preclude relief." *Id.* (internal quotation marks and citation omitted).

Brady presents three claims. First, he argues that the evidence presented at trial was insufficient to sustain his conviction. Second, Brady contends that his trial counsel was ineffective for failing to interview and call Marshawn Brady, Sondra Burke, Elliot Moore, and Flora Small as exculpatory witnesses and failing to file a motion to dismiss

the indictment based on perjury during the grand jury proceedings.  Third, Brady contends that the admission of "other crimes" evidence violated his right to due process.

1.      **Sufficiency of the evidence claim**

Brady first contends that "[t]he evidence in this case, even when taken in the light most favorable to the State[,] fell woefully short of establishing that Brady acted in any manner other than recklessly," and therefore "[t]he Illinois Appellate Court's conclusion to the contrary was an unreasonable application of *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]."  Pet.'s Br. at 21, 25.

A challenge to the constitutional sufficiency of the evidence supporting a state conviction "is cognizable in a federal habeas corpus proceeding."  *Jackson*, 443 U.S. at 321.  When considering such a challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original).

Brady has failed to demonstrate that the appellate court applied *Jackson* unreasonably.  He argues that "[t]here was no evidence on an essential element of the offense; i.e., Brady's intentional conduct in shooting McDaniel."  Pet.'s Br. at 25.  At the same time, however, he concedes that the appellate court based its conclusions on several items of evidence, including the condition of Brady's apartment, which suggested that there had been a struggle between Brady and McDaniel; Brady's failure to call an ambulance; his departure from the hospital and subsequent flight from

Chicago; his statement to Makeeta Burke that he shot McDaniel; and evidence of his prior acts of violence toward McDaniel. *Id.* at 20. Taken as a whole, this evidence, though circumstantial, would permit a rational factfinder to conclude that Brady intentionally shot McDaniel. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) ("A verdict may be rational even if it relies solely on circumstantial evidence."). Accordingly, after reviewing the record, the Court finds that the appellate court did not unreasonably apply *Jackson* in holding that a rational trier of fact could have found Brady guilty of first degree murder beyond a reasonable doubt.

Brady argues, without citation to authority, that "[w]here the statement from the only person present at the time of the shooting stated it was accidental, no rational trier of fact could have found proof beyond a reasonable doubt." Pet.'s Br. at 21. But in Illinois, when a "defendant denies intent, the State may prove defendant's intent through circumstantial evidence." *People v. Phillips*, 392 Ill. App. 3d 243, 259, 911 N.E.2d 462, 478 (2009). As noted above, there was significant circumstantial evidence of an intentional shooting, and the appellate court considered that evidence. Standing alone, Brady's assertion to Burke that the shooting was accidental does not render the evidence constitutionally insufficient to support a conviction, nor does it make the appellate court's assessment of the evidence unreasonable.

Brady nonetheless argues that the appellate court unreasonably ignored alternate explanations and other evidence in upholding his conviction. Pet.'s Br. at 21-23. But on review under section 2254, a court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

By framing the evidence as "contradictory and inconclusive" and presenting alternate explanations for his actions, Brady asks the Court to turn this standard of review on its head.  Pet.'s Br. at 25.  Contrary to Brady's argument, it is not respondent's responsibility to "explain how [the evidence] amount[s] to proof beyond a reasonable doubt."  Pet.'s Reply at 2.  Rather, Brady bears the burden of demonstrating that it was unreasonable for the appellate court to conclude that a rational trier of fact could have found him guilty.  Because he has not met this burden, Brady is not entitled to relief based on insufficiency of the evidence.

## 2.    Ineffective assistance of counsel claim

Brady next argues that his trial counsel was constitutionally ineffective and the appellate court unreasonably applied *Strickland* in concluding otherwise.

*Strickland* requires a petitioner to make a two-part showing in order to obtain habeas relief.  First, the petitioner "must show that counsel's performance was deficient," to the point "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 687.  This requires the petitioner to demonstrate that counsel's performance "fell below an objective standard of reasonableness."  *Id.* at 688.  In evaluating counsel's performance, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and therefore must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.

Second, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694. In other words, the petitioner must demonstrate "a probability sufficient to undermine confidence in the outcome." *Id.* In determining prejudice, courts consider the totality of the evidence. *Id.* at 695. Finally, a court need not "address both components of the [*Strickland*] inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### a.  Failure to call certain witnesses

Brady's ineffective assistance claim first addresses his trial counsel's failure to call Marshawn Brady, Sondra Burke, Elliot Moore, and Flora Small as witnesses at trial. Brady asserts that in their affidavits, these individuals "made claims that, if believed, would have significantly undercut the state's theory of prosecution." Pet.'s Br. at 26. Brady thus argues that the appellate court "unreasonably applied the principles enunciated in *Strickland* in concluding that trial counsel was not ineffective for failing to present the testimony of those witnesses." *Id.*

Brady attached the would-be witnesses' affidavits as exhibits to his petition. Each affidavit contains assertions that, if believed, would have cast doubt on significant elements of the circumstantial evidence that formed the basis for the finding that Brady intentionally shot McDaniel. Despite this, the appellate court affirmed the dismissal of Brady's post-conviction petition without ordering an evidentiary hearing. Moreover, Brady's trial counsel did not provide an affidavit or testify about his interactions with the affiants. For these reasons, the record does not currently provide an adequate factual basis for the Court to determine whether the appellate court's application of either part of *Strickland* was reasonable. An evidentiary hearing would aid the Court in assessing

what trial counsel knew or should have known, whether he followed up, why he did not call the witnesses, whether the witnesses would have provided probative and credible exculpatory testimony, and so on.

AEDPA, however, imposes limits on when a federal court can order an evidentiary hearing on a petition for habeas corpus. Specifically, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" except in certain defined circumstances. 28 U.S.C. § 2254(e)(2)(A) & (B). But by its own terms, "[section] 2254(e)(2)'s bar only applies when the failure to develop the factual basis for a claim is attributable to the petitioner." *Ward v. Jenkins*, 613 F.3d 692, 698 (7th Cir. 2010). Accordingly, "[i]f the Petitioner establishes that he was diligent in his attempts to develop the factual record in the state court, he does not have to satisfy the remaining provisions of [section] 2254(e)(2) in order to obtain an evidentiary hearing." *Dalton v. Battaglia,* 402 F.3d 729, 736 (7th Cir. 2005) (internal quotation marks omitted).

Brady does not bear the blame for failing to develop the factual basis of his ineffective assistance claims. He requested a hearing in his *pro se* post-conviction petition and attached the would-be witnesses' affidavits to it. The state court, however, denied the petition without a hearing. Because Brady was diligent in his efforts to develop the record during state proceedings, the Court concludes that section 2254(e)(2) does not bar his request for an evidentiary hearing. *See Davis v. Lambert*, 388 F.3d 1052, 1060-61 (7th Cir. 2004) (concluding that where petitioner "requested that the court grant him an evidentiary hearing" and "described the anticipated content

of the testimony" even though he did not provide affidavits, "[petitioner was] not responsible for failing 'to develop the factual basis of his claim in State court' under [section] 2254(e)(2)").

In situations where section 2254(e)(2) does not apply, a petitioner "is entitled to an evidentiary hearing in federal court if (1) he has alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing." *Ward*, 613 F.3d at 698. Given that the state courts denied Brady a hearing on this claim, the second element of this test is met. The only remaining issue is whether Brady would be entitled to relief assuming that the allegations in his petition are true.

The affidavits provided by Brady contain information that would significantly undercut the evidence supporting his conviction. For example, Marshawn Brady's affidavit indicates that he ransacked Brady's bedroom looking for valuables when he and Brady's mother came to the house to pick up Brady's daughter. Pet.'s Br., Ex. C at 1. This testimony would have rebutted the prosecution's trial theory that the damage and disarray in the apartment was evidence of a struggle between Brady and McDaniel. *See, e.g.*, Trial Tr. 309:24-312:3.

Sondra Burke's affidavit states that she picked Brady up at his house at 12:20 a.m. on May 10, 2001 and saw McDaniel alive at that time. Pet.'s Br., Ex. D at 1. Burke further asserts that she dropped Brady off near his apartment at 1:10 a.m. *Id.* Given that McDaniel arrived at Provident hospital at 1:35 a.m., Burke's affidavit would contradict the prosecution's theory that Brady left McDaniel to bleed "for at least an hour[.]" Tr. 16:10.

Elliot Moore's affidavit states that he saw Brady running down a street at 2:00 a.m. on May 10, 2001 and heard him say that McDaniel had been shot and he needed to get his daughter out of his apartment. Pet.'s Br., Ex. E at 1. Moore also states that Brady used Moore's cell phone to call Provident Hospital to check on McDaniel's condition. *Id.* This evidence would challenge the prosecution's theory that Brady's departure from the hospital was due not to his concern for his infant daughter but rather was the result of his "consciousness of guilt" and lack of concern for McDaniel. *See, e.g.,* Tr. 341:3, 342:5-12.

Finally, Flora Small's affidavit states that she spoke with Brady at 2:30 a.m. on May 10, 2001. Small states that Brady was crying about the ransacking of his apartment and his daughter's absence and later came to Small's home asking to use her phone. Pet.'s Br., Ex. F at 1. She also states that Brady told her the shooting was accidental and repeated the general sequence of events provided by the other affiants. *Id.* at 1-2. Though parts of Small's testimony may be of questionable admissibility, her statements about Brady's demeanor and actions would tend to rebut the prosecution's theory—accepted by the court in its findings of fact—that Brady fabricated his story about an accidental shooting merely to avoid alienating Makeeta Burke. Tr. 314:13-24, 351:3-8.

In sum, the above testimony, if believed, would rebut much of the circumstantial evidence the prosecution used to argue and that the trial court relied on to conclude that Brady intentionally shot McDaniel. Given the absence of an explanation in the record for why trial counsel failed to call these witnesses, this omission arguably would be outside "the wide range of reasonable professional assistance" contemplated by

*Strickland*.  466 U.S. at 689.  Moreover, the fact that much of the prosecution's evidence went uncontested might well render the existence of this new exculpatory evidence "sufficient to undermine [the Court's] confidence in the outcome" of the trial. *Id.* at 694.

Additionally, the testimony, if believed, could well reveal the appellate court's application of *Strickland* to be unreasonable on both parts of the *Strickland* test.  First, the appellate court concluded that because the affiants "are all similarly lacking in direct knowledge of the shooting . . . trial counsel's failure was [not] unreasonable."  *Brady II*, slip op. at 7.  But if the affiants' testimony is believed, their lack of direct knowledge of the shooting itself would be relatively insignificant given the prosecution's reliance on circumstantial evidence to prove its case.  And that testimony, if believed, would tend to render unreasonable the appellate court's conclusion that the testimony was unlikely to affect the outcome of the trial.  The appellate court seems to have drawn an inference that counsel could conclude their testimony is unreliable simply because the affiants were close to Brady, without considering the contents of the testimony and without any indication that counsel had made any such assessment on reasonably competent grounds.

In sum, Brady has alleged facts which, if proven true, would entitle him to habeas relief under section 2254(d)(1).  He was denied an opportunity to fully present these facts during the state court proceedings.  Accordingly, the Court orders an evidentiary hearing at which Brady can further develop the factual basis for his ineffective assistance claim.

**b.     Failure to seek dismissal based on perjury in the grand jury**

Brady also argues that his trial counsel was constitutionally ineffective because he "fail[ed] to file a motion to dismiss the indictment based on the use of perjured testimony" during the grand jury proceedings.  Pet.'s Br. at 38.  Though Brady presented this argument in his post-conviction petition, his appellate counsel failed to raise it on appeal from the petition's dismissal.  *Id.*

"[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Brady did not raise this ineffective assistance claim during direct appeal and did not raise it during his post-conviction proceedings.  Accordingly, he procedurally defaulted the claim.  *See Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("[T]he failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default.").

**i.     Cause and prejudice**

Despite procedural default, a petitioner may qualify for a writ of habeas corpus based on the defaulted claim "if [he] demonstrates cause for the default and prejudice from the asserted error."  *House v. Bell*, 547 U.S. 518, 536 (2006).  Under this test, "cause is defined as[] an objective factor, external to the defense, that impeded the defendant's efforts to raise the claim in an earlier proceeding."  *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010) (internal quotation marks omitted).  Prejudice is defined as "an error which so infected the entire trial that the resulting conviction violates due

process." *Id.*

Brady argues that he can demonstrate cause because his "appellate counsel was ineffective in failing to argue on appeal from the denial of the post conviction petition that the indictment was secured through the use of perjured testimony." Pet.'s Br. at 38. However, "ineffective assistance of post-conviction counsel does not supply 'cause' for the cause-and-prejudice formula." *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002). Accordingly, Brady's argument that "[i]neffective assistance of post conviction counsel can constitute 'cause'" fails. Pet.'s Reply at 9.

### ii. Fundamental miscarriage of justice

Aside from cause and prejudice, a petitioner can obtain habeas relief "only if he falls within the narrow class of cases . . . implicating a fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (internal quotation marks omitted). To demonstrate a fundamental miscarriage of justice, a petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327). "[W]hen considering an actual-innocence claim in the context of a request for an evidentiary hearing, [courts] . . . may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 537 (internal quotation marks omitted).

As discussed above, the Court has granted an evidentiary hearing in order to further develop the factual basis for Brady's ineffective assistance claim and assess the credibility of his proposed witnesses. The Court will be in a better position to analyze

the applicability of the miscarriage-of-justice exception once it has heard further evidence.

### 3. Other act evidence claim

Finally, Brady argues that the trial court erroneously admitted evidence of alleged prior acts of violence by Brady toward McDaniel. According to Brady, "the purpose behind admitting the prior bad acts evidence [was to show that] Brady's propensity to physically McDaniel resulted in him intentionally murdering her on May 10, 2001." Pet.'s Br. at 42. This violated "Brady's due process right to a fair trial," because "[t]here was no way for the judge to genuinely entertain Brady's defense in the face of such prejudicial testimony and argument." Pet.'s Reply at 15; Pet.'s Br. at 43. Brady asserts that the appellate court unreasonably applied *Michelson v. United States*, 335 U.S. 469 (1948), in rejecting this claim. Pet.'s Br. at 43.

Brady's argument misses the mark. The Supreme Court in *Michelson* did not hold, as a matter of federal law, that the admission of evidence of prior bad acts to show propensity constitutes a violation of a defendant's due process rights. Rather, the Court, in discussing "[c]ourts that follow the common-law tradition," merely recognized that such courts "almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt." *Michelson*, 335 U.S. at 475. Similarly, the Seventh Circuit has cited *Michelson* in noting that "common-law courts traditionally considered the propensity inference relevant but improper." *United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009); *see also id.* (noting that "[Federal] Rule [of Evidence] 404(b) explicitly adopts *this common-*

*law tradition*.") (emphasis added).  Accordingly, *Michelson* does not provide, as a matter of "clearly established federal law," that the admission of "other crimes" evidence for propensity violates the due process rights of a defendant.  28 U.S.C. § 2254(d)(1); *see also Bennett v. Bartley*, No. 07 C 1975, 2008 WL 4866169, at *4 (N.D. Ill. June 23, 2008) (recognizing that "the Supreme Court has not established a clear precedent regarding" the due process implications of "permitting the use of past crimes evidence to show propensity").

Aside from *Michelson*, Brady cites no other Supreme Court precedent in support of his argument.  The Court is unaware of any such precedent.  *See Hammer v. Karlen*, 342 F.3d 807, 811 n.3 (7th Cir. 2003) (quoting *Watkins v. Meloy*, 95 F.3d 4, 6-7 (7th Cir. 1996)) ("When the state merely fails to limit the prosecution's evidence, the only constitutional principle to which the defendant can appeal is a catch-all sense of due process, and the appeal almost always fails.").  Indeed, the Supreme Court has expressly reserved judgment on this question.  *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  Therefore, because Brady's allegations do not establish a due process violation, he cannot show that the appellate court unreasonably applied federal law in rejecting his appeal on this ground.

Even if Brady could show that Supreme Court precedent clearly establishes a defendant's due process right to be free from the introduction of "other crimes" evidence for propensity, he would be unable to show that such precedent was

unreasonably applied by the appellate court in this case. As the court recognized in affirming Brady's conviction on direct appeal, in Illinois such evidence "is not admissible for the purpose of showing the defendant's disposition or propensity to commit crime," but "is admissible . . . where relevant to prove *modus operandi*, intent, identity, motive or absence of mistake." *People v. Illgen*, 145 Ill. 2d 353, 364-65, 583 N.E.2d 515, 519 (1991); *Brady I*, slip op. at 24-25. The trial judge found that evidence of prior abuse by Brady "was admissible only on the state of mind and motive. If the [witness's] statement relates to that, it will be allowed. If it doesn't, I will consider [defense counsel's] motion to strike." Tr. 238:10-14. Moreover, the judge did not discuss the "other crimes" evidence at all in his findings, suggesting he may have disregarded it in finding Brady guilty. In short, there is no indication that the other act evidence was actually used as "propensity" evidence in Brady's case. *See Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001) (alteration in original) (quoting *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999)) (noting that state court evidentiary rulings form a basis for habeas corpus relief only if they result in errors "so prejudicial that [they] compromise[d] the petitioner's due process right to a fundamentally fair trial").

## Conclusion

For the reasons stated above, the Court orders an evidentiary hearing in order to permit further development of the factual basis for Brady's claim of ineffective assistance of counsel. The Court otherwise denies Brady's petition. The case is scheduled for a status hearing on February 9, 2011 at 9:30 a.m. for the purpose of

setting a hearing date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 27, 2011