**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **ISAIAH BRADY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 2098** |
| | ) | |
| **MARCUS HARDY, Warden, Stateville** | ) | |
| **Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Illinois judge found Isaiah Brady guilty of first degree murder in 2002 and

sentenced him to a fifty-year term of imprisonment. Brady exhausted his state court

remedies and petitioned the Court pursuant to 28 U.S.C. § 2254 to issue a writ of

habeas corpus.

The Court previously denied Brady's petition in part and ordered an evidentiary

hearing on his remaining claims. *See United States ex rel. Brady v. Hardy*, No. 10 C

2098, 2011 WL 291058 (N.D. Ill. Jan. 27, 2011) (*Brady I*). The Court later vacated this

ruling in part in light of the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct.

1388 (2011). *See United States ex rel. Brady v. Hardy*, No. 10 C 2098, 2011 WL

1575662 (N.D. Ill. Apr. 25, 2011) (*Brady II*). Brady then filed a motion to withdraw the

claim that was to be the subject of an evidentiary hearing. The Court granted this

motion and took Brady's remaining ineffective assistance claim under advisement. *See*

docket no. 41.  For the reasons stated below, the Court now denies Brady's petition.

**Background**

For purposes of completeness, the Court will reiterate and expand upon the factual and procedural history it provided in its initial January 27, 2011 decision.  *See Brady I*, 2011 WL 291058, at *1-6.

Andrea McDaniel was Brady's girlfriend and the mother of his child.  In the early morning hours of May 10, 2001, McDaniel was brought to the emergency room at Provident Hospital on the south side of Chicago.  She was unconscious and had sustained a single gunshot wound to the head.  After receiving treatment, McDaniel was transferred to Cook County Hospital, where she died on May 12, 2001.  The medical examiner ruled McDaniel's death a homicide, and Brady became a suspect in the ensuing investigation by the Chicago Police Department.  On June 6, 2001, Brady was arrested in Los Angeles, California.  He was extradited to Illinois and charged with first degree murder.

**1.     State court trial**

Brady's bench trial began on November 12, 2002.  He was represented by Lawerance Vance.  Brady waived his right to a jury trial prior to opening statements.

The prosecution's first witness was Nancy Jones, an assistant medical examiner who had performed an autopsy on McDaniel's body.  She testified as an expert in the field of forensic pathology.  Jones testified that McDaniel died as a result of a single gunshot wound to the right temporal/parietal region of her skull.  Because there was no evidence of close-range firing, Jones concluded that the shot was fired from at least two

feet away.

Cassandra McDaniel, Andrea McDaniel's mother, testified that until she died, McDaniel lived with Brady and the couple's eighteen-month-old daughter at 5608 South Wabash Avenue, apartment 303. She also stated that the last time she saw McDaniel was two weeks prior to her death.

Makeeta Burke testified that in May 2001, she approached and befriended Brady at a bar in Gardena, California. According to Burke, Brady told her that his name was Rico Holt and that he was from New York, but his mother lived in Chicago. Burke also said that Brady told her he came to California to take care of his grandfather and hide from law enforcement authorities who were investigating him because his friends were drug dealers. On June 6, 2001, Burke and Brady were both arrested. Burke testified that shortly before their arrest, Brady told her that he accidentally shot and killed his daughter's mother, whom Brady called "Drea." According to Brady, the gun unexpectedly fired when he picked it up off of a shelf in his bedroom. Brady also told Burke that he and McDaniel had a history of arguing and that the police had previously come to their home. For this reason, Brady told Burke, he fled after taking McDaniel to the hospital.

Gail Gray, an emergency room nurse at Provident Hospital, testified that she was on duty when McDaniel arrived at the hospital at approximately 1:35 a.m. on May 10, 2001. Gray said a security guard informed her that someone was outside who seemed to have been shot. She went outside and saw McDaniel lying in the back seat of a car with blood on her head. Brady was with McDaniel and identified himself as her boyfriend. Gray and other hospital personnel put McDaniel in a wheelchair and took

her to a resuscitation room.  Gray then went to speak with Brady, who provided some information about McDaniel's medical history.  After speaking with Brady, Gray returned to the resuscitation room.  Ten to fifteen minutes later, a police officer came to the resuscitation room looking for Brady, but Gray was unable to find him.

Corey Hall testified that he and his sister, Beverly Green, were close friends of McDaniel.  At the time of McDaniel's death, Hall lived in an apartment across the courtyard from the apartment McDaniel and Brady shared.  On the evening of May 9, 2001, Hall was sitting with several friends, including Brady and McDaniel, on his back porch.  At one point while Brady was present but before McDaniel had arrived, a silver .38 caliber pistol fell out of Brady's pants and onto the porch.  According to Hall, Brady said nothing and immediately put the pistol back into his pants.  Hall said he later told someone about the incident but admitted he did not mention it during his first conversation with an investigator from the State's Attorney's office.

Hall also testified that Brady told McDaniel to go home at approximately 11:00 p.m., which she did.  Brady left approximately thirty to forty minutes later.  McDaniel briefly returned to Hall's apartment later to borrow taco seasoning, and sometime thereafter Hall went to McDaniel's apartment to eat tacos.  As he left McDaniel's apartment at approximately 12:10 or 12:15 a.m., Hall saw Brady returning to the apartment.  Then, approximately an hour and ten minutes later, Hall was walking to a nearby store and saw Brady walking down an alley toward Brady's apartment.  Hall shook hands with Brady, and the two spoke briefly.  Hall said that Brady seemed nervous.  Brady told Hall he wanted to go to the store and asked Hall to wait for him.  Brady then went up to his apartment.  Hall waited for approximately three to five

minutes, but Brady never came down, so Hall went to the store without him. Hall also testified that Brady and McDaniel did not have a phone in their apartment, and the nearest payphone was approximately one block away.

Antoinette Dill testified that she lived in an apartment one floor down and across from the apartment Brady and McDaniel shared. At approximately 1:30 a.m. on May 10, 2001, Dill awoke to the sound of Brady and another man speaking near her window. The unidentified man said, "She's dead," and Brady said, "She's not dead yet, help me carry her." Dill then heard a woman screaming for someone to call an ambulance and saying "don't move her." Dill left her apartment and looked outside through her back door. She saw Brady and a woman near a black car. When she went outside to help, she saw Brady and another man putting McDaniel into the back seat of the black car and a woman sitting on the driver's side. The woman asked Dill to call 911, but Brady replied, "No, mama, we can't wait for an ambulance. You need to get her to [the] hospital." Dill then returned to her apartment and called 911. When she came back downstairs, the black car was no longer in the parking lot.

Wanda Riley, Brady's grandmother, testified that she lived just around the corner from Provident Hospital. Some time after 1:30 a.m. on May 10, 2001, Brady came to Riley's apartment and asked to borrow her car. Brady said that he needed the car because McDaniel had been shot and he needed to pick up his daughter. Riley refused because she needed her car to go to work that day. Brady then took some clothes that belonged to Riley's son, grabbed Riley's car keys, and left the apartment. Riley went after Brady and stopped him as he tried to start the car. Brady got out of the car, and Riley took the car keys out of his hands. Brady then ran into Washington Park in the

direction of his apartment, leaving the clothes behind. About five minutes later, Brady's mother and her husband arrived at Riley's home with Brady's infant daughter.

Officer Joseph Dunigan testified that he and a partner, Leonard Stoker, investigated McDaniel's shooting. They first went to Cook County Hospital to determine McDaniel's condition and were told that she was in the emergency room. The officers then went to McDaniel's apartment, where they spoke with other officers and photographed the scene. Dunigan observed blood on the rear stairs of the apartment building and in the kitchen, as well as bloody towels and clothing on the kitchen floor. The master bedroom was in a state of disarray. There were markings on the bedroom door and damage to the door near the handle. Clothes and the mattress were strewn about, and a television set was on the floor. Dunigan saw blood on the wall in the bedroom and on the mattress. He also found two live .38 caliber bullets in the bedroom. Finally, Dunigan examined a black Pontiac parked nearby. He found blood on the right front passenger seat back and headrest, on the rear passenger side door, and on the driver's seat. Dunigan took samples of the various blood stains.

Cynara Edmond, a forensic scientist, testified that she examined a knife that investigators recovered from Brady and McDaniel's kitchen. She stated that small stains on the knife tested positive for blood. Edmond was unable to determine whether these samples contained human blood and testified that they could have come from a non-human source, such as hamburger meat.

Kathleen Kozak, also a forensic scientist, testified that she performed DNA analysis on blood samples taken from various locations in and around Brady and McDaniel's apartment, including the knife, the kitchen floor, a mattress pad, the

bedroom walls, the rear porch stairs, the porch handrail, and a 2000 Pontiac. Kozak testified that the samples taken from the knife contained DNA that matched or was consistent with the DNA profiles of both Brady and McDaniel. Kozak stated that the DNA from the knife could have originated in saliva or skin cells, as opposed to blood. The remaining samples all contained DNA that matched McDaniel's DNA profile.

Officer Miguel Cavrales testified that on February 22, 2000, about fifteen months before McDaniel's death, he and a partner responded to a domestic disturbance call at 5608 South Wabash. Cavrales spoke with McDaniel upon arriving and observed that she had puffy eyes, a swollen eyelid, and a bump on her right cheek. McDaniel said she had been struck several times. After speaking with McDaniel, Cavrales began trying to find Brady, who was not in the apartment at the time. Cavrales also testified that the next day, February 23, he responded to another domestic disturbance call from the apartment at 10:15 p.m. On that occasion, McDaniel was agitated and jumpy when Cavrales spoke with her. Afterwards, Cavrales again went looking for Brady.

Officer James Davis testified that he and another officer responded to a third domestic disturbance call from 5608 South Wabash on June 15, 2000, about eleven months before McDaniel's death. When he arrived, Davis heard a woman inside the apartment scream "help me, help me" through the door. When Davis knocked on the door and identified himself, a man inside said that no one had called the police. Davis heard the woman scream again, and the officers forced their way into the apartment. Upon entering, Davis saw McDaniel crying and with bruises on the right side of her face and her right arm. She told Davis that Brady had struck her on the face and arm with a broomstick. The officers placed Brady under arrest. After being informed of his rights,

Brady told the officers he hit McDaniel because she stayed out at night and did not take care of their children. After arresting Brady, the officers recovered a .38 caliber revolver from the bedroom of the apartment.

Detective Edward Adams testified that he handled Brady's extradition from California. Adams arrived in Los Angeles on June 21, 2001 and spoke with Brady at the Los Angeles County Jail. There, Brady identified himself to Adams as "Rico Holt."

Detective Michael Rose was the last witness for the prosecution. He testified that he investigated the apartment shared by Brady and McDaniel on May 10, 2001. Rose observed blood on the back stairs leading to the apartment, as well as significant amounts of blood in the kitchen, the hallway, and a bedroom. He also saw a crack in the bedroom door on both sides of the doorknob. According to Rose, the bedroom was in a state of disorder: there were clothes on the floor, and the mattress and box spring were turned over. Rose later went to the home of Wanda Riley, Brady's grandmother, who told Rose that Brady came to her home after 1:30 a.m. and took clothing and the keys to Riley's car. Riley told Rose that she caught up to Brady, struggled with him to get her keys back, and heard Brady say McDaniel was dead.

After the prosecution completed its case-in-chief, Brady's trial counsel indicated that he would not call any witnesses. After speaking with Brady, however, counsel decided to call two witnesses. The first was Jeremy Washington, who testified that he is Brady's uncle. But after the prosecution indicated that Brady's trial counsel had failed to disclose Washington as a witness during discovery, defense counsel ended his examination of Washington.

The second defense witness was Claude Sanders, who testified that he is

Brady's grandfather. Sanders said that on May 10, 2001, he told Brady to leave town and lie low because he had heard Brady's life was in danger. Sanders told Brady he should turn himself in once Brady's family raised enough money to hire an attorney.

After Sanders testified, the defense rested. Following closing arguments, the court called a recess for the afternoon.

The next day, November 14, 2002, the court found Brady guilty of first degree murder beyond a reasonable doubt. The court stated that it found Makeeta Burke's testimony credible and persuasive because she recounted details of the crime that could have been known only by Brady. The court also noted that Corey Hall's testimony was credible and corroborative of the fact that Brady was the shooter.

The court then proceeded to discuss its conclusion that the shooting was not accidental. The court relied on what it considered to be overwhelming circumstantial evidence of an intentional shooting. First, the court noted that Brady's statement to Burke that the shooting was accidental was a fabrication he made to maintain his relationship with her. The court then stated that Brady's behavior following the shooting—including his failure to call paramedics or seek help from any neighbors—indicated the shooting was not accidental. In this regard, the court also noted that Brady's first call was to his mother and that he had left McDaniel untreated while waiting for his mother and stepfather to arrive.

The court also found significant Brady's attempt to obtain clothes and a car from his grandmother, concluding that the only reasonable inference was that he intended to flee. The court found Brady's alternative explanation—that he was trying to find his infant daughter—was implausible, because Brady could have gone with his mother from

the hospital directly to his apartment rather than running alone to his grandmother's home first. The court also noted that Brady had never returned to the hospital to check on McDaniel and that instead he had gone to his grandfather to seek legal advice. The court found highly significant the fact that Brady fled to California and used an alias, even when first interviewed by the Chicago police there. In sum, the court concluded that Brady's actions were those of a person guilty of murder, not someone who accidentally injured a person he loved. The court summed up by stating that "the defendant's guilt is proven primarily by his admission to Miss Burk[e], by the overwhelming circumstantial evidence and b y common sense." Trial Tr. 354:1-3.

After trial, Brady fired his attorney and hired new counsel. He also filed a motion for a new trial based on ineffective assistance of trial counsel. The motion was based solely on the allegation that Brady's trial counsel was under the influence of alcohol at various points during the trial. The court held an evidentiary hearing on the motion on May 9 and May 29, 2003. Several witnesses testified, including family members of Brady who had interacted with his trial counsel and attended the trial, Brady's trial counsel, and one of the trial prosecutors. On June 12, 2003, the court denied the motion. It concluded that no credible evidence suggested Brady's trial counsel was intoxicated at any point during trial and that contrary testimony by Brady's family members lacked credibility due to bias.

On March 8, 2004, the court sentenced Brady to consecutive prison sentences of twenty-five years for first degree murder and twenty-five years for personally discharging the firearm that caused McDaniel's death. *See* 730 ILCS 5/5-8-1(a)(1)(d)(iii).

## 2. Direct appeal

On appeal, Brady contended that (1) the evidence was insufficient to support a conviction for first degree murder, (2) his trial counsel was ineffective for presenting inconsistent theories and failing to seek a continuance to investigate Hall's statement that Brady dropped a gun at Hall's apartment on May 9, 2001, and (3) the court erroneously admitted other act evidence.

In an order issued on August 18, 2005, the Illinois Appellate Court affirmed Brady's conviction. *People v. Brady*, No. 1-04-1152, slip op. (Ill. App. Aug. 18, 2005). The court rejected Brady's arguments and found that the evidence presented at trial was sufficient to support his conviction, Brady's trial counsel was not ineffective, and the trial judge did not abuse his discretion in admitting evidence that Brady had abused McDaniel in the past. Brady subsequently filed a petition for leave to appeal, which the Illinois Supreme Court denied on December 1, 2005. *People v. Brady*, 217 Ill. 2d 571, 844 N.E.2d 40 (2005). Brady did not petition the United States Supreme Court for a writ of certiorari.

## 3. Brady's post-conviction petition

Brady filed a *pro se* post-conviction petition in state court on August 22, 2006, asking the court to order a hearing and vacate his conviction and sentence. Brady argued that (1) the evidence was insufficient to support his conviction, (2) his trial counsel was ineffective for not requesting an involuntary manslaughter instruction and failing to present several witnesses, (3) both trial and appellate counsel were ineffective for failing to argue that his due process rights were violated due to perjury during the

grand jury proceedings, and (4) the court erroneously imposed consecutive sentences.

In support of his argument regarding counsel's failure to call witnesses, Brady attached the affidavits of Marshawn Brady, Sondra Burke, Elliott Moore, and Flora Small. In Brady's view, these affidavits contained potentially exculpatory testimony.

Marshawn Brady stated in his affidavit that he and Brady's mother, Darlisa Kendall, went to Brady's apartment shortly after the shooting. Pet. Ex. C. While Kendall tended to Brady's infant daughter, whom Brady apparently left at the apartment when he went to the hospital, Marshawn broke into Brady's bedroom. *Id.* He then proceeded to ransack the room looking for valuables, ultimately leaving it in a state of disarray. *Id.* He found a bag of shoes and electronics, but left these items in the apartment at the urging of Kendall. *Id.*

Sondra Burke stated in her affidavit that she saw McDaniel alive at approximately 12:20 a.m. on May 10, 2001 when she picked up Brady and took him to her home. Pet. Ex. D. On the way, Brady called his mother from a pay phone. *Id.* Burke and Brady then drove to Burke's apartment, where they stayed for thirty-five or forty minutes. Brady then asked Burke to drive him home because his mother was coming to pick him up. *Id.* At around 1:10 a.m., Burke dropped Brady off at his apartment.

Elliott Moore stated that he saw Brady running down Wabash Street at approximately 2:00 a.m. on May 10, 2001. Pet. Ex. E. Brady told Moore that his girlfriend had been shot and that he needed to retrieve his infant daughter from his apartment. *Id.* Moore then drove Brady to his apartment and Brady went inside. *Id.*

-12-

Two or three minutes later, Brady came outside. He was crying and screamed that someone had kidnapped his daughter and ransacked his apartment. *Id.* Brady then used Moore's cell phone to call Provident Hospital to check on McDaniel's condition. *Id.* After hanging up, Brady told Moore that McDaniel had been transferred to Cook County Hospital. He made another phone call to an unspecified person and asked Moore to drive him to the intersection of 43rd Street and King Drive. Moore dropped Brady off there. *Id.*

Finally, Flora Small asserted in her affidavit that she received a telephone call from Brady at around 2:30 a.m. on May 10, 2001. Pet. Ex. F. Brady asked Small if she had picked up Brady's daughter from his apartment earlier that night. She said no. *Id.* at 1. Brady, who was crying, said that McDaniel had been shot and his apartment had been ransacked. *Id.* Brady then said that McDaniel had been transferred to another hospital. *Id.* Small asked Brady to come to her home, and approximately ten minutes later, Brady arrived. He used Small's telephone to make a phone call and then told Small that his daughter was in his grandmother's care. *Id.* After Small asked Brady what happened, he explained that he accidentally shot McDaniel while she was folding clothes in the bedroom of Brady and McDaniel's apartment. *Id.* Once he realized that McDaniel had sustained a gunshot wound, Brady carried her into the kitchen. *Id.* Hearing his mother's car horn outside, he then carried McDaniel's body down to the car. Brady and his mother then took McDaniel to Provident Hospital. *Id.* After realizing that he had left his daughter in the apartment, Brady went to his grandmother's house to borrow a shirt and to use his grandmother's car to drive back to his apartment. *Id.*

Brady's grandmother refused to lend him her car, so Brady ran toward his apartment. *Id.* at 2. Eventually, a friend drove by and gave Brady a ride the rest of the way. *Id.* Brady told Small that he planned to turn himself into the police, but first he needed to talk to his family. *Id.* He called a cab and left Small's home at around 3:30 a.m.

On September 15, 2006, the state trial court dismissed Brady's post-conviction petition as frivolous and patently without merit. The court did not order an evidentiary hearing.

Brady appealed. His appeal focused solely on his claim that his trial counsel was ineffective for failing to call the witnesses whose affidavits Brady had submitted. On July 30, 2008, the Illinois Appellate Court affirmed the dismissal of Brady's petition. *People v. Brady*, No. 1-06-3486, slip op. (Ill. App. Jul. 30, 2008). The court reviewed the contents of the affidavits and concluded that Brady "failed to present the gist of a constitutional claim of ineffective assistance of counsel." *Id.* at 7.

The court found Brady's petition deficient under both requirements of the test for ineffective assistance established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Brady*, slip op. at 7-8. It found trial counsel's actions to be objectively reasonable for two reasons. First, the court noted that "although defendant asserts in his post-conviction petition that each of the affiants were 'previously interviewed by counsel,' none of the affiants aver that they ever shared the information contained in their affidavits with defense counsel." *Id.* at 7. Second, the court stated that because "none of the witnesses appear to have any direct knowledge of the shooting," it could not "conclude that trial counsel's failure to call these witnesses was unreasonable." *Id.*

With respect to prejudice, the second part of the *Strickland* test, the court

"note[d] that each of the affiants was either a friend or relative of [Brady]. Accordingly,

based on their close relationship to [Brady], it is unlikely that even if the witnesses had

been called, that [sic] their testimony would have altered the trial result." *Id.* at 8. For

these reasons, the court concluded that Brady's petition failed to establish the gist of a

constitutional claim of ineffective assistance of counsel and was therefore subject to

summary dismissal. *Id.* Brady filed a petition for leave to appeal, which the Illinois

Supreme Court denied on September 30, 2009. *People v. Brady*, 233 Ill. 2d 568, 919

N.E.2d 356 (2009).

**4.      Proceedings before this Court**

Brady filed his petition for a writ of habeas corpus in this Court on April 5, 2010.

His petition presented four claims. First, Brady argued that the evidence presented at

trial was insufficient to support his conviction. Second, Brady contended that his trial

counsel was ineffective because he failed to call certain witnesses at trial. Third, Brady

argued that his trial counsel was ineffective because he failed to file a motion to dismiss

the indictment based on the prosecution's presentation of allegedly perjured testimony.

Fourth and finally, Brady asserted that the trial judge violated his right to due process by

admitting evidence of other bad acts.

The Court rejected Brady's first and fourth claims in its January 27, 2011

decision. *See Brady I*, 2011 WL 291058, at *7-8, 12-13. It also ordered an evidentiary

hearing to permit Brady to further develop the factual basis for his ineffective assistance

of counsel claims. *Id.* at *8-12. Subsequently, however, the United States Supreme

Court held that "review under [section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Because Brady's ineffective assistance of counsel claims were adjudicated on the merits in state court,[1] the Court vacated its decision in *Brady I* to the extent that it ordered an evidentiary hearing. *See Brady II*, 2011 WL 1575662, at *2. Despite this, however, the Court found (and the parties agreed) that *Pinholster* does not bar a court from holding an evidentiary hearing "to assess a claim of actual innocence offered to overcome a procedural default." *See id.* at *3. Because Brady procedurally defaulted his second ineffective assistance claim, the Court determined that the previously scheduled evidentiary hearing would instead be held "only for the purpose of determining whether Brady can overcome the procedural default of this claim by showing his actual innocence." *Id.*

On July 12, 2011, Brady filed a motion to withdraw his second ineffective assistance of counsel claim. *See* docket no. 39. The Court granted Brady's motion and vacated the scheduled evidentiary hearing. *See* docket no. 41. Brady's first ineffective assistance of counsel claim—the only remaining claim in this case—is now before the Court.

## Discussion

A prisoner convicted in state court is entitled to a writ of habeas corpus if he is

---

[1] Brady's first ineffective assistance claim, which involved his trial counsel's failure to call certain witnesses, was adjudicated on the merits by the Illinois Appellate Court in its July 30, 2008 decision. *See* Resp. Ex. I at 7-8. By contrast, the state trial court dismissed Brady's second ineffective assistance claim in an apparently merits-based ruling. *See* Resp. Ex. L at C148-C154; *Brady II*, 2011 WL 1575662, at *3. Because Brady did not raise this claim on appeal, it was procedurally defaulted. *See id.*

being held in violation of the Constitution or laws of the United States. 28 U.S.C. §

2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a

federal court may grant a writ of habeas corpus only if the petitioner can show that the

state court's decision was "contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United

States" or "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." *Id.* § 2254(d)(1) & (2); *Griffin v.*

*Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

The "contrary to" prong of § 2254(d)(1) is met if "the state court applies a rule

that contradicts the governing law set forth" by the Supreme Court. *Williams v. Taylor*,

529 U.S. 362, 405 (2000). The "unreasonable application" prong is satisfied "if the

state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of petitioner's case,"

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003), or "unreasonably refuses to extend a

principle to a context in which it should apply." *Griffin*, 622 F.3d at 841 (internal

quotation marks and citation omitted). Lastly, a decision involves an unreasonable

determination of the facts if the petitioner rebuts the presumption of correctness that

applies to state court fact-finding by clear and convincing evidence. *See Miller-El v.*

*Dretke*, 545 U.S. 231, 240 (2005).

The Court assesses Brady's ineffective assistance of counsel claim pursuant to

the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668

(1984). Under *Strickland*, a petitioner must make a two-part showing to obtain a writ of

habeas corpus.  First, he must show that his attorney's performance "fell below an objective standard of reasonableness."  *Id.* at 688.  Courts must make every effort "to eliminate the distorting effects of hindsight" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  At the same time, courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690.  In particular, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.  Second, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  A court considers the totality of the evidence to determine whether the petitioner "has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."  *Id.* at 695-96.

Because the state court cited and applied the *Strickland* standard in rejecting Brady's claim, its decision was not contrary to clearly established Supreme Court precedent.  *See Williams*, 529 U.S. at 405.  The Court will therefore consider whether the court unreasonably applied *Strickland* or unreasonably determined the facts of the case in doing so.  *See* 28 U.S.C. § 2254(d)(1), (2).

**1.     Deficiency**

Brady first argues that the state court unreasonably applied *Strickland* when it

found that Brady's trial counsel acted reasonably by not calling Marshawn Brady, Sondra Burke, Elliott Moore, and Flora Small as witnesses at trial.  Pet. Br. at 26.  Each of these witnesses signed affidavits containing testimony that, in Brady's view, refuted the prosecution's key arguments at trial and undermined the evidence supporting those arguments.  *Id.* at 27.  Respondent argues that it is unclear whether Brady's attorney knew about the information in the affidavits, and therefore he "cannot be said to have acted in an unreasonable manner when he failed to call them as witnesses."  Resp. Br. at 22.  Respondent also contends that Brady has failed to "overcome the presumption that counsel's decision not to call the witnesses was a strategic one."  *Id.*

The state appellate court offered two justifications for its finding that Brady's counsel reasonably failed to call the affiants at trial.  The first of these justifications was rooted in an unreasonable determination of the facts in light of the evidence that was before the appellate court at the time.  The second was an unreasonable application of *Strickland*.

First, the appellate court found that "although defendant asserts in his post-conviction petition that each of the affiants were previously interviewed by counsel, none of the affiants aver that they ever shared the information contained in their affidavits with defense counsel."  Resp. Ex. I at 7 (internal quotation marks omitted).  The court then cited cases indicating that such knowledge is a prerequisite for post-conviction relief.  *Id.*  In other words, the court drew a factual inference that Brady's counsel was unaware of the information in the affidavits.  The court cited no other allegations or evidence in support of this inference.

It was unreasonable for the court to draw this inference.  Brady expressly alleged

in his post-conviction petition that his attorney and investigator had interviewed the affiants. *See* Resp. Ex. L at C21. Illinois law required court to accept the allegations in Brady's petition as true and liberally construe them in his favor. *See People v. Edwards*, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001). In light of Brady's allegations and the applicable standard of review, the only inference the court reasonably could have drawn was that Brady's counsel knew the substance of the affiants' testimony but nevertheless decided not to call them as witnesses or neglected to do so. To the extent that the appellate court assumed otherwise when it made its deficiency finding, this finding was the result of an unreasonable determination of the facts of the case in light of the evidence presented to the court.

Second, the appellate court stated that because "none of the witnesses appear to have any direct knowledge of the shooting," Brady's counsel did not act unreasonably in failing to call them as witnesses. Resp. Ex. I at 7. This was an unreasonable application of *Strickland*. The prosecution presented no direct evidence of Brady's involvement in the shooting or of his mental state. Rather, Brady was convicted based upon a collage of circumstantial evidence. As a result, it was unreasonable to analyze the evidence from the uncalled witnesses simply by saying they had no direct knowledge of the crime. Rather, the real question is whether their testimony would have rebutted the prosecution's circumstantial case.

As the Court noted in its first decision in this case, the information in the affidavits, taken as true, had the potential to rebut at least some portions of the prosecution's case against Brady. *See Brady I*, 2011 WL 291058, at *10-11. Marshawn Brady would have testified that he ransacked Brady's bedroom, thus

challenging the prosecution's argument that the disarray in the bedroom resulted from a struggle between Brady and McDaniel.  *See* Pet. Ex. C.  The testimony of Sondra Burke would have provided an alternative, and shorter, time frame for Brady's presence at his apartment around the time of the shooting, which would have enabled him to challenge the prosecution's assertion that he left McDaniel to bleed for an hour or more after the shooting.  *See* Pet. Ex. D.  And finally, Flora Small and Elliott Moore would have provided a more favorable characterization of Brady's behavior on the night of the shooting.  *See* Pet. Exs. E, F.

Rather than looking at how these witnesses' testimony would have impacted the prosecution's circumstantial case against Brady, the appellate court summarily concluded that Brady's counsel acted reasonably simply because lacked direct evidence regarding the shooting.  In doing so, the court unreasonably failed to "judge the reasonableness of counsel's challenged conduct *on the facts of the particular case*." *Strickland*, 466 U.S. at 690 (emphasis added).

Respondent argues that counsel's actions could be seen as a sound trial strategy and therefore the appellate court's decision cannot have been unreasonable. *See* Resp. Br. at 22-23.  The appellate court, however, made no finding (at least no express finding) that counsel had made a strategic decision.  Rather, the court relied on three points:  it said the witnesses had not shared their information with defense counsel; it said they had no direct knowledge of the shooting; and it said they all had close relationships with Brady.  Resp. Ex. I at 7-8.  Though the court said that defense counsel had not acted unreasonably, its findings and conclusions do not hint at a

determination that counsel had made a reasonable strategic decision. Indeed, to do so would have been inconsistent with the court's apparent determination that counsel was unaware of the witnesses' information.

If one nonetheless could read the appellate court's opinion as suggesting that trial counsel had made a reasonable strategic decision, that would be an unreasonable application of *Strickland* as well. Admittedly, judicial scrutiny of an attorney's performance is "highly deferential." *Strickland*, 446 U.S. at 689. The Supreme Court, however, has stressed that courts should not assess whether an attorney's actions might be deemed "strategic" based on hindsight and conjecture regarding the tactical environment at trial. *See Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (concluding that hindsight regarding "the relative importance of various components of the State's case . . . . sheds no light on the reasonableness of counsel's decision not to request any discovery," although it may bear on whether counsel's errors prejudiced the defendant); *see also Griffen v. Warden, Maryland Corr. Adjustment Ctr.*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("[C]ourts should not conjure up tactical decisions an attorney could have made, but plainly did not"). In other words, although courts presume that counsel acted competently, they do not appropriately reach this conclusion by way of *post hoc* rationalization.

The appellate court cited no evidence or argument suggesting that Brady's counsel acted strategically in declining to call these witnesses. And that is for good reason, as the record contained no evidence that would support such a finding. In the complete absence of such evidence, no court could reasonably find that counsel's

actions were justified on strategic grounds. Even the deferential standard embodied in *Strickland* does not contemplate the sort of conjecture that respondent suggests would justify the appellate court's decision in this case. *See id.* at 1359 ("Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another.").

## 2. Prejudice

Despite the appellate court's unreasonable deficiency finding, Brady is not entitled to a writ of habeas corpus unless the court's prejudice finding was also based on an unreasonable application of *Strickland* or an unreasonable determination of the facts. In this regard, Brady contends that the appellate court misapplied *Strickland* and that the affiants' testimony "specifically rebutted the circumstantial evidence the State used to convict Brady of first degree murder." Pet. Br. at 31-34. Respondent counters that the appellate court reasonably found that Brady was not prejudiced by his attorney's failure to call the affiants as trial witnesses because (1) the affiants would have been subject to impeachment for bias and offered implausible testimony and (2) the affiants' testimony did not rebut other, significant evidence that was indicative of Brady's guilt. Resp. Br. at 24-25.

As a preliminary matter, the Court rejects Brady's contention that the appellate court applied the wrong legal standard. He appears to take issue with the court's statement that "it is unlikely that even if the witnesses had been called, that [sic] their testimony would have altered the trial result," arguing that "[t]he likelihood of a changed outcome is not what *Strickland* requires." *Id.* at 8; *see* Pet. Br. at 34. As the Supreme Court made clear in *Strickland*, however, a petitioner's burden is to show "that the

decision reached *would reasonably likely have been different* absent the errors."
*Strickland*, 466 U.S. at 696 (emphasis added). Though Brady asserts that the state
courts required him to "show that his counsel's error here *would not have* altered the
outcome," Pet. Br. at 34 (emphasis added), nothing in the appellate court's decision
suggests that it held Brady to this higher burden.

As discussed above, the trial court issued an oral ruling explaining its reasons for
finding Brady guilty of first degree murder. In doing so, the court identified the evidence
that, in its view, supported a finding that Brady intentionally shot McDaniel. First, the
court noted that Brady's behavior after the shooting was inconsistent with the notion
that he accidentally shot McDaniel. The court gave weight to the fact that called his
mother rather than calling the paramedics or trying to get help from neighbors. Trial Tr.
351:11-16. Then, instead of going directly from the hospital to his apartment to pick up
his child or asking his mother to do so, Brady went to his grandmother's house to
borrow clothes and her car. The court found that this indicated that Brady intended to
flee, particularly because Brady's mother was with him at the hospital and had a car.
*See id.* 351:24-352:18. The court also appeared to have been persuaded by the
prosecution's argument that if the shooting had been an accident, Brady would have
gone back to the hospital to be with McDaniel or would have turned himself in to the
authorities, rather than visiting his grandfather for "legal advice." *Id.* 352:18-23, 353:17-
24.

The court also discussed Brady's behavior in the period following the shooting. It
found highly significant the fact that Brady had fled Chicago, used an alias while staying
in California, and made false exculpatory statements to Makeeta Burke about the

shooting.  *Id.* 351:5-6, 353:1-14.  The court felt that Brady could have found other ways to deal with his fear of retaliation from McDaniel's family, such as contacting a "reporter, religious leader or attorney to . . . present him for questioning or surrender him with the proper instructions not to answer any questions."  *Id.* 353:6-9; *see also id.* 353:14-24.  As such, in the court's view, the "only reasonable inference based on all the facts and circumstance[s] in the case" was that Brady intended to flee because he had intentionally shot McDaniel.  *Id.* 352:4-5.

Flora Small's affidavit contains little information that could have cast doubt on the evidence cited by the trial court in its oral ruling.  Although she recounted a number of statements by Brady on the night of the shooting that supported Brady's theory that the shooting was accidental, there is little reason to believe that any of these out-of-court statements would have been admissible over a hearsay objection.  Aside from these statements, the only favorable and potentially admissible evidence in Small's affidavit is her own assertion that Brady was crying when she spoke with him.  *See* Pet. Ex. F.  That evidence was in no way inconsistent with the prosecution's case.

Marshawn Brady's affidavit contains admissible evidence that would have countered the prosecution's contention that the disorderly state of Brady's bedroom resulted from a struggle between Brady and McDaniel.  *See, e.g.,* Trial Tr. 309-12.  Specifically, Marshawn stated that he had forcibly entered Brady's bedroom and pillaged the room looking for valuables.  Pet. Ex. C.  According to Marshawn, "the bedroom was neat and orderly upon his entry" and "it was his pillaging for valuables that left the bedroom in disarray."  *Id.*

Elliott Moore's affidavit contains a number of hearsay statements from Brady that, though exculpatory, would have been inadmissible at trial. These include Brady's assertion that he called Provident Hospital to check on McDaniel's condition. *See* Pet. Ex. E. Other facts in the affidavit, such as Moore's assertion that he drove Brady to the corner of 43rd Street and King Drive, are of little or no value to Brady. *Id.* At the same time, Moore's affidavit contains likely admissible testimony regarding his perception of Brady's behavior on the evening of the shooting. According to Moore, Brady cried and yelled hysterically after re-entering his apartment and seeing that it was in a state of disarray. *Id.* This would have tended to corroborate the evidence from Marshawn statement that he, not Brady, had caused that state of disarray.

Finally, Sondra Burke's affidavit contains information that would have countered one aspect of the prosecution's case against Brady. She stated that she saw McDaniel alive and unharmed at 12:20 a.m. on the night of the shooting and was with Brady from that time until approximately 1:10 a.m., when she took Brady back to his apartment. Pet. Ex. D. Given that McDaniel arrived at the hospital at roughly 1:35 a.m., this testimony could have countered the prosecution's argument that Brady left McDaniel to bleed "for at least an hour" before he took her to the hospital. Trial Tr. 16:10.

In short, some of the evidence from the uncalled witnesses tends to rebut certain aspects of the prosecution's case against Brady. It was for this reason that the Court ordered an evidentiary hearing on Brady's ineffective assistance claims. When the Court assesses this evidence against the state trial court's explanation of its finding of guilt, however, it cannot conclude that the appellate court finding of lack of prejudice was objectively unreasonable. Although the additional evidence could have rebutted

the prosecution's theory that Brady's bedroom was in disarray because of a struggle between Brady and McDaniel, there is no indication that this theory was a factor in the trial judge's finding of guilt. *See* Trial Tr. 349-54. Similarly, although Sondra Burke's affidavit suggests that Brady may not have left McDaniel to bleed for an extended period of time, the trial court only briefly and vaguely discussed the issue of delay in McDaniel's treatment. *See id.* 351:16-19. By contrast, the court discussed at great length the evidence of Brady's preparation to flee and his deliberate flight, and it also placed emphasis on his use of an alias and his false exculpatory statements to Makeeta Burke. *See generally id.* 351:5-8 & 351:24-353:24. None of the additional evidence that Brady cites would have undermined the trial court's conclusion that there was no plausible, innocent explanation for these actions by Brady. Finally, although the testimony of Elliott Moore and Flora Small would have supported a claim that Brady was emotionally distressed in the aftermath of the shooting, nothing in the record suggests that this was a significant factor in the court's determination of guilt.

In summary, the affidavits provided by Brady contain some admissible evidence that could have rebutted certain aspects of the prosecution's theory. At the same time, those particular matters, taken together, do not appear to have been terribly significant in the trial court's analysis of the evidence offered at trial. The trial court's finding of guilt was based upon a significant quantum of evidence that was not rebutted by the affidavits. As a result, it was not unreasonable for the appellate court to find that Brady failed to show that the trial court's decision "would reasonably likely have been different absent" trial counsel's errors. *Strickland*, 466 U.S. at 696.

For these reasons, the appellate court's finding of lack of prejudice was not

based on an unreasonable application of *Strickland* or an unreasonable determination of the facts of the case.  Brady is not entitled to relief under 28 U.S.C. § 2254(d).

### Conclusion

For the reasons stated above, the Court denies Brady's petition for a writ of habeas corpus.  The Court directs the Clerk to enter judgment in favor of respondent and against Brady.  The Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) regarding Brady's claim of ineffective assistance of counsel addressed in this decision but declines to issue a certificate of appealability regarding Brady's other claims.

_____s/ Matthew F. Kennelly_____
MATTHEW F. KENNELLY
United States District Judge

Date:  October 3, 2011